**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| **FRANK MINOR,**<br><br>*Plaintiff,*<br><br>v.<br><br>**DELAWARE RIVER AND BAY AUTHORITY, et al.,**<br><br>*Defendants.* | **Case No.  1:19-cv-21343-JDW** |

## <u>MEMORANDUM</u>

Elections have consequences, including for policymakers at government agencies. A government agency can terminate its policymakers for political reasons, but it can't do the same thing to its non-policymakers. Frank Minor claims that the Delaware River and Bay Authority crossed that line and fired him from a position as the DRBA's Deputy Executive Director ("DED") for aligning with New Jersey Governor Phil Murphy, rather than with his political rival, New Jersey Senator Steve Sweeney. The DRBA, on the other hand, claims that it fired him for governance-related reasons. There is conflicting evidence about the nature of the DED position and the reasons for the DRBA's termination of Mr. Minor. Depending on which version of events you credit, this is either a case of sordid machine politics silencing a critic or a case of a government employer terminating a stubborn and incompetent employee. Because there are genuine issues of fact, the Court will, in most respects, deny Defendants' Motion for Summary Judgment.

I.      **BACKGROUND**

A.      **Relevant Facts**

1.      **The DRBA and the DED**

Delaware and New Jersey created the DRBA through an interstate compact with two main purposes: (1) to operate various transportation facilities that connect the two states; and (2) to further economic development between Delaware and southern New Jersey. Congress recognized the compact, *see* 104 Stat. 2784, 101. P.L. 565 (1990), as did both states to the compact, *see* N.J.S.A. 32:11E-1; 17 Del. C. § 1701. A board of twelve commissioners, six from Delaware and six from New Jersey, oversees and governs the DRBA. There is a Chairman and Vice-Chairman of the Board of Commissioners, as well as an Executive Director and a DED. Only the New Jersey enabling statute mentions the DED, authorizing the commissioners to appoint a DED to help "oversee commerce and economic development activity" in the two compacting States. *See* N.J.S.A. 32:11E-1 (Art. IV(E)).

The DRBA commissioners created the DED position in 2004 through Resolution 04-04. There is conflicting evidence about what the DED position entailed. Resolution 04-04 describes the position as "a key leadership role" meant to ensure "that the core mission of the [DRBA] is achieved." (ECF No. 38-5 at 3.) On paper, the position's responsibilities include economic development, creation of an annual marketing plan and communications plan, working to create an annual DRBA community-giving strategy, and assisting with local and state government liaisons. Additionally, several commissioners and other high-level officials at the DRBA referred to the DED as one

2

of the "Core Four" positions in the DRBA. (*See* ECF No. 38-13, at 101:3-25; ECF No. 38-14, at 29:22-30:8).

The DRBA Chairman, James Hogan, offered a different view, explaining that there "wasn't much to the [DED] job," that he wanted to combine it with the airport director position "to make it a real job for the salary it paid," and that it was "commonly said" that the DED wasn't a real job, but rather "was a ginned up job to make a political deal." (ECF No. 41-12, at 137:1-11.) He also noted the DRBA had "an underutilized deputy executive director who does very little" and the position was in essence a "luxury job[]." (*Id.*, at 110:13-19.) In addition, Resolution 04-04 does not identify the DED as a policymaking position, in contrast to the resolution creating the Executive Director position, which specifies "policymaking" as a job responsibility.

The DRBA has an Employment Manual, which outlines its employees' rights and responsibilities. Regarding termination, the Employment Manual states: "Each permanent full-time employee, who has held that status for a period of at least twelve (12) months shall be deemed to be employed upon the condition that the employee shall not be removed from the particular office, position or employment except for good and sufficient cause or reason. It is the intent of these regulations to create for the permanent full-time employee of the [DRBA] a tenure of employment which will be permanent, subject to good behavior, the proper performance of the employee's duties." (ECF No. 41-14 at 66.).

### 2.    Mr. Minor's political affiliation and termination

The commissioners appointed Mr. Minor, a citizen of New Jersey, to the DED position in April 2009. At the time, Mr. Minor also served as the Mayor of Logan

Township. As DED, Mr. Minor had an office at the DRBA's building in Delaware, which he listed as his work address on his resume. Mr. Minor could not hire or fire DRBA employees, nor did he have authority over the DRBA's budget. He attended meetings, and during those meetings conducted clerical tasks like reading minutes into the record, but also would occasionally lead presentations. It is unclear what Mr. Minor's salary was. Mr. Minor argues there was an "evolution" in the position and that he had lost several of the responsibilities outlined in his job description by November 2014. For example, Mr. Minor directly supervised seven DRBA employees in 2009, but by 2014 his only direct report was a single administrative assistant.

In 2017, Mr. Minor supported Phil Murphy for Governor of New Jersey. When Governor Murphy won the election, he appointed Mr. Minor to his transition team. This was a problem, according to Mr. Minor, because Governor Murphy was a political rival of New Jersey State Senate President Stephen Sweeney. Senator Sweeney "wasn't happy" when he learned Mr. Minor was on Governor Murphy's transition team, (ECF No. 41-13, 71:18-25), a sentiment that Politico corroborated in an article published on December 4 titled "Murphy's Transition Missteps Roil Sweeney." Mr. Minor had political differences with Senator Sweeney, starting with Senator Sweeney's decision not to run for governor in 2013, which limited Mr. Minor's chance for upward mobility in state politics.

Chairman Hogan had been "very very supportive" of Senator Sweeney's political career. (ECF No. 41-13, 48:4-15.) Mr. Hogan admitted that "'loyalty' could be a fair word" to describe his relationship with Senator Sweeney. (ECF No. 41-12 at 111:16-23.) When Mr. Minor learned of Senator Sweeney's displeasure at his joining

Governor Murphy's transition team, he resigned from the team. But, according to Mr. Minor, "the damage was already done," and Senator Sweeney pressed Mr. Hogan to terminate Mr. Minor before Governor Murphy was sworn in and could exercise his veto power over the DRBA's decision.

On December 19, 2017, the DRBA commissioners voted to terminate Mr. Minor. On either December 13 or 14, 2017, Mr. Hogan met with his choice to replace Mr. Minor—Stephen Williams, the DRBA's Director of Airports—and told him he had 24-48 hours to decide whether he would take the DED job. The time pressure came from the fact that Governor Murphy would soon take office and have veto power over any DRBA resolution within 10 days of its approval by the commissioners, making December 19, 2017, the last day to act. While Mr. Hogan and the DRBA contend they wanted to combine the DED position with the Director of Airports position for efficiency purposes, their alternate candidate, had Mr. Williams declined the position, would not have filled the director of airports role but only taken on the responsibilities of the DED.

On December 19, 2017, the DRBA Commissioners passed Resolution 17-67. In that Resolution, the Board explained that it "no longer believes that Mr. Minor is the individual best suited to serve" as DED. (ECF 38-1.) On the morning the commissioners voted to terminate Mr. Minor, Senator Sweeney's long-time attorney called Mr. Minor before the vote to tell him not to come into work because the commissioners were going to terminate him later that morning. Then, shortly after the commissioners voted to terminate Mr. Minor, Mr. Hogan called Senator Sweeney to let him know. After Mr. Minor's termination, he filed for unemployment in Delaware.

### B.   Procedural History

Mr. Minor filed his Complaint on December 13, 2019. He then filed an Amended Complaint that asserted (1) a First Amendment claim for violation of his rights to political affiliation, (2) a Fourteenth Amendment due process claim, (3) a breach of contract claim, and (4) a claim for municipal liability under 42 U.S.C. § 1983. Defendants moved to dismiss the Amended Complaint. The Court granted the motion as to the due process claim only. Having now completed discovery, Defendants move for summary judgment on the three remaining claims. That Motion is ripe for decision.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) permits a party to seek, and a court to enter, summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he plain language of Rule 56[(a)] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quotations omitted). In ruling on a summary judgment motion, a court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quotation omitted). However, "[t]he non-moving party may not merely deny the allegations in the moving party's pleadings; instead he must show where in the record there exists a genuine dispute over a material fact." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citation omitted).

## III.    DISCUSSION

### A.    First Amendment Claim

To make out a *prima facie* case for a claim of discrimination based on political patronage in violation of the First Amendment, Mr. Minor must show that: (1) he was employed at a public agency in a position that does not require political affiliation; (2) he was engaged in constitutionally protected conduct; and (3) the protected conduct was a substantial or motivating factor in the government's employment decision. *See Galli v. N.J. Meadowlands Comm'n*, 490 F.3d 265, 271 (3d Cir. 2007). If Mr. Minor makes this showing, then Defendants may "avoid a finding of liability by proving by a preponderance of the evidence that the same employment action would have been taken even in the absence of the protected activity." *Id.* (quote omitted).

### 1.    Nature of the position

As to the first element, if a government agency claims to have "properly discharged an employee because political affiliation is central to the job itself," then the government agency bears the burden of proof. *Id.* (cite omitted). The government can satisfy this burden if it shows the employee is in a policymaking role. *See Elrod v. Burns*, 427 U.S. 347, 367 (1976). Factors that bear on whether a job has a policymaking role include whether the employee: (a) has duties that are non-discretionary or non-technical; (b) participates in discussions or other meetings; (c) prepares budgets; (d) possesses the authority to hire and fire other employees; (e) has a high salary; (f) retains power over others; and (g) can speak in the name of policymakers. *See Brown v. Trench*, 787 F.2d 167, 169 (3d Cir. 1986). The "key factor seems to be not whether the employee was a supervisor or had a great deal of responsibility[,] but whether

[he] has meaningful input into decisionmaking concerning the nature and scope of a major [ ] program." *Armour v. Cty. of Beaver, Pa.*, 271 F.3d 417, 429 (3d Cir. 2001).

The DRBA argues the DED was a policymaking position, but the evidence on this point is conflicting. Several commissioners and other high-level officials at the DRBA referred to the DED as one of the "Core Four" positions in the DRBA. (*See* ECF No. 38-13 at 101:3-25; ECF No. 38-14, at 29:22-30:8). Resolution 04-04 describes the position as "a key leadership role" meant to ensure "that the core mission of the [DRBA] is achieved." (ECF No. 38-5 at 3.) During Mr. Minor's tenure as DED, he was responsible for the DRBA's economic development plan, marketing plan, and communications plan, all of which entail a good deal of discretion.

Other evidence suggests that, by the time the DRBA fired Mr. Minor, the position was not a policymaking position. There is evidence the position evolved over time and that Mr. Minor had lost several of the responsibilities outlined in his job description. Mr. Minor directly supervised seven DRBA employees in 2009, and by 2014 his only direct report was a single administrative assistant. Mr. Minor could not hire or fire DRBA employees, nor did he have authority over budgets. He also conducted clerical tasks like reading minutes into the record at meetings. Additionally, while Resolution 04-04 does not identify the DED as a policymaking position, the resolution for the Executive Director position does specify policymaking as a responsibility of that job.

Mr. Hogan also downplayed the role of the DED, saying that there "wasn't much to the job." He explained that he wanted to combine it with the airport director position "to make it a real job for the salary it paid." And he recounted that it was

"commonly said" that the DED wasn't a real job but rather "was a ginned up job to make a political deal." (ECF No. 41-12 at 137:1-11.) He also said that the DED did "very little" and the position was a "luxury job[]." (*Id.* at 110:13-19.)

It is not the Court's role at summary judgment to weigh this competing evidence. As it stands, there is a genuine issue of fact whether the DED was a policymaking position. Taking the facts in the light most favorable to Mr. Minor, the DED was not a policymaking position.

### 2.    Constitutionally protected activity

The Third Circuit has held that a plaintiff can meet the second element of a political discrimination claim if he suffers harm because of active support for a different candidate within the same political party. *See, e.g.*, *Robertson v. Fiore*, 62 F.3d 596, 600-01 (3d Cir. 1995); *Bennis v. Gable*, 823 F.2d 723, 731 (3d Cir. 1987) ("[A] citizen's right not to support a candidate is every bit as protected as his right to support one."). That's what happened to Mr. Minor, who affiliated with Governor Murphy's transition team. Mr. Hogan was aligned with Senator Sweeney, who had a political rivalry with Governor Murphy. Mr. Minor's association with Governor Murphy was protected conduct. Defendants do not dispute this.

### 3.    Substantial or motivating factor

Construing the facts in the light most favorable to Mr. Minor, it appears that Mr. Hogan and Senator Sweeney were not pleased that Mr. Minor aligned with Governor Murphy. Mr. Hogan and Senator Sweeney both found out he had been appointed to Governor Murphy's transition team through the media. Senator Sweeney admitted he "wasn't happy" when he learned about this. (ECF No. 41-13 at 71.) It seems this was

at least partly because of Senator Sweeney's rivalry with Governor Murphy and prior disputes with Mr. Minor. Mr. Hogan admitted he was "loyal to Sweeney" and had been his friend and political ally. (ECF No. 41-12 at 111:7-23.)

Less than a month after the media reported Mr. Minor would join Governor Murphy's transition team, the DRBA commissioners voted to terminate him. A few days before the vote, Mr. Hogan met with Mr. Williams and gave him 24-48 hours to decide whether to take the job. While Mr. Hogan and the DRBA contend they wanted to combine the DED position with the director of airports position for efficiency purposes, their alternate candidate would not have filled both roles. And Senator Sweeney seems to have had a particular interest in Mr. Minor's termination. On the morning the commissioners voted to terminate him, Senator Sweeney's long-time attorney called Mr. Minor to tell him not to come into work because the commissioners were going to fire him later that morning. Then, shortly after the commissioners voted to terminate Mr. Minor, Mr. Hogan called Senator Sweeney to let him know. The temporal connection between Mr. Minor joining Governor Murphy's transition team and his termination, coupled with Senator Sweeney's interest and involvement in his termination, gives a reasonable factfinder a basis to conclude that the DRBA terminated Mr. Minor for his affiliation with Governor Murphy.

## B. Breach Of Contract Claim

### 1. Applying state law to bi-state compacts

Under the Compact Clause of the United States Constitution, "No State shall, without the Consent of Congress, . . . enter into any Agreement or Compact with another State . . . ." U.S. Const. art. I, § 10, cl. 3. In other words, "Under the Compact

Clause, . . . states may enter into agreements regarding matters of common concern provided they obtain the consent of Congress." *Int'l Union of Operating Eng'rs, Local 542 v. Del. River Joint Toll Bridge Comm'n*, 311 F.3d 273, 274 (3d Cir. 2002).

Bistate entities are not "extensions of each compacting state's authority," but are rather formed through each state's surrender of a portion of its sovereignty to the new entity. *Id.* at 276. "Such a surrender of state sovereignty should be treated with great care, and the Supreme Court has stated that courts should not find a surrender unless it has been 'expressed in terms too plain to be mistaken.'" *Id.* (quoting *Jefferson Branch Bank v. Skelly*, 66 U.S. 436, 446 (1861)). To determine the terms of a state's surrender of a portion of its sovereignty to a Compact Clause entity courts look to the compact agreement itself, which is a "contract[ ] subject to the principles of contract law." *Doe v. Pa. Bd. of Prob. & Parole*, 513 F.3d 95, 105 (3d Cir. 2008). The extent to which each compacting state's laws apply to a compact entity turns on the language of the compact and the contracting states' intent. *See Local 542*, 311 F.3d at 280.

The Compact creating the DRBA authorizes it to "enter into contracts and agreements with . . . any individual . . . deemed necessary or advisable for the exercise of its purposes and powers," 12 N.J.S.A. 32:11E–1 (Art. VII), and contains what amounts to a sue-and-be-sued clause. These provisions show that Delaware and New Jersey consented to surrender the portion of their sovereignty necessary for the DRBA to enter into contracts and sue and be sued in relation to those contracts. "[It] would be a perverse rule of law if the [DRBA] was empowered to enter into contracts without being held accountable under the law of contracts." *Chafin v. Del. River & Bay Auth.*,

No. 06–836, 2006 WL 3780765, at \*7 (D.N.J. Dec. 20, 2006). Therefore, Mr. Minor may sue the DRBA for breach of contract.

### 2.   Choice of law

The Court uses New Jersey's choice-of-law rules to determine whether New Jersey or Delaware substantive law applies to Mr. Minor's breach of contract claim. *See Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455, 462 (3d Cir. 2006). New Jersey courts use a two-step analysis to determine what state's law applies to a contract claim. The Court first assesses whether there is an "actual conflict" between the laws of the potentially interested states on the issue in question. *Lebegern v. Forman*, 471 F.3d 424, 428 (3d Cir. 2006). If there is, the Court determines "which state has the most meaningful connections with and interests in the transaction and the parties." *NL Indus., Inc. v. Commercial Union Ins. Co.*, 65 F.3d 314, 319 (3d Cir. 1995).

There is an actual conflict between New Jersey and Delaware law here. Under New Jersey law, a party may bring "a cause of action for breach of contract against employers who fail to honor the express or implied promises made in an employee manual or handbook." *Ratti v. Serv. Mgmt. Sys., Inc.*, No. 06–6034, 2008 WL 4004256 at \*4 (D.N.J. Aug. 25, 2008) (citing *Woolley v. Hoffmann–La Roche, Inc.*, 99 N.J. 284 (1985)). To avoid this, an employer must provide a disclaimer that "makes clear that the employer continues to have the absolute power to fire anyone with or without cause." *Nicosia v. Wakenfern Food Corp.*, 136 N.J. 401, 413-15 (1994). "[I]n the absence of a prominent disclaimer written in straightforward terms that an employee is subject to discharge at will an implied promise contained in an employment manual that an employee will be fired only for cause is enforceable against an employer." *Spence-*

*Parker v. Del. River & Bay Auth.*, 616 F. Supp. 2d 509, 525 (D.N.J. 2009) (internal quotations omitted).

Under Delaware law, although "[s]tatements in an employee handbook may alter the at-will status," *Mann v. Cargill Poultry, Inc.*, No. 88C–AU37, 1990 WL 91102, at *5 (Del. Super. Ct. June 13, 1990), the doctrine is limited in two important ways where New Jersey law is not. *See Lindsey v. M.A. Zeccola & Sons, Inc.*, 26 F.3d 1236, 1241 (3d Cir. 1994) ("Delaware Courts will not hold an employment relationship to be anything but at-will absent clear and explicit terms providing otherwise."). First, under Delaware law, an "employer's written or oral statements to a prospective employee concerning the conditions of his employment are not enforceable against the employer without some basic contract consideration," above and beyond continued employment. *Mann*, 1990 WL 91102, at *5-7. Second, Delaware courts have held that an employer may foreclose a contract claim based on an employee handbook simply by including a disclaimer stating that the handbook "do[es] not create . . . an employment agreement." *Bunting v. Citizens Fin. Grp., Inc.*, No. 03–013, 2006 WL 1067321, at *4 (Del. Super. Ct. Apr. 13, 2006).

Because an actual conflict exists between the laws of New Jersey and Delaware, the Court must determine which state has the more meaningful connections with and greater interests in the transaction and the parties. In making this determination, the Court looks to the "enumeration of contacts" in the Restatement (Second) of Conflicts § 188 "to guide the identification of the state with the most significant relationship" to the transaction. *Id.* at 320. Specifically, the Court considers: (a) the place of contracting; (b) the place of negotiation of the contract; (c) the place of performance;

13

(d) the location of the subject matter of the contract; and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties. *See* Restatement (Second) of Conflicts § 188(2).

Here, like in *Spence-Parker*, Mr. Minor's office was in Delaware and he spent a significant amount of his time performing his job in Delaware. Additionally, he received Delaware unemployment and noted his place of employment as Delaware on his resume. However, Mr. Minor is a citizen of New Jersey, not Delaware. And critically, unlike *Spence-Parker*, the New Jersey legislature created the DED position by statute. N.J.S.A. 32:11E-1.2 (Art. IV(e)). The New Jersey statute includes a subsection (e) to Article IV, which authorizes the DRBA to hire a DED and outlines the DED's role. *Id.* The Delaware statute does not have this subsection, suggesting New Jersey has some special interest in the DED position. Of two states, where the interests are otherwise relatively balanced, the state that wrote a statute to create the position has a stronger interest in the outcome of this case. Therefore, New Jersey law applies.

The DRBA's Employment Manual states:

> Each permanent full-time employee, who has held that status for a period of at least twelve (12) months shall be deemed to be employed upon the condition that the employee shall not be removed from the particular office, position or employment **except for good and sufficient cause or reason**. It is the intent of these regulations to create for the permanent full-time employee of the Authority **a tenure of employment which will be permanent, subject to good behavior**, the proper performance of the employee's duties. (ECF No. 41-14 at 66) (emphasis added).

The Employment Manual makes an express promise that a full-time employee that has been employed for more than 12 months can only be fired for cause. Mr. Minor worked at the DRBA from 2009-2017 and is therefore a "permanent full-time

employee" under the terms of the Employment Manual. The Term Sheet and the DRBA's by-laws do not provide a prominent disclaimer that the DRBA could terminate Mr. Minor at will. The by-laws and Term Sheet note that "the [DED] is appointed by a resolution of the Board of Commissioners and may be dismissed by the Board of Commissioners, authorized by Board resolution," and that the commissioners "shall have the authority for the appointment and dismissal" of the DED. (ECF No. 39-2, ¶ 18; ECF No. 38-8.) While that language indicates that the commissioners are the ones who have the authority to fire the DED, it does not say that such authority is absolute or that the commissioners can fire the DED at will. Without such a disclaimer, under New Jersey law Mr. Minor's breach of contract claim survives summary judgment.

### C.    Municipal Liability

A plaintiff who pursues a claim of municipal liability under § 1983 may proceed in two ways. He may "put forth that an unconstitutional policy or custom of the municipality led to his . . . injuries, or that [those injuries] were caused by a failure or inadequacy by the municipality that reflects a deliberate or conscious choice." *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019) (cleaned up). "Plaintiffs that proceed under a municipal policy or custom theory must make showings that are not required of those who proceed under a failure or inadequacy theory, and vice versa." *Id.* at 105. The two avenues "remain distinct: a plaintiff alleging that a policy or custom led to his or her injuries must be referring to an unconstitutional policy or custom, and a plaintiff alleging failure-to-supervise, train, or discipline must show that said failure amounts to deliberate indifference to the constitutional rights of those affected." *Id.* at 105-06; *see also Estate of Roman v. City of Newark*, 914 F.3d 789, 798-99 (3d Cir. 2019).

("[Plaintiff] has not pled a municipal policy . . . [but] has . . . adequately pled that the City failed to train, supervise, and discipline its police officers.").

Mr. Minor appears to advance a policy/custom theory. But the only argument he advances to support this claim is the conclusory statement that, "The DRBA has a documented long standing [] custom and practice of making employment decisions based upon whether an individual is 'too political.'" (ECF No. 41 at 23.) While brevity may be the soul of wit, Mr. Minor may have been too witty. Without pointing to the documents that "documented" those "longstanding" customs and policies, his municipal liability claim fails.

### D.    Qualified Immunity For Individual Defendants

Qualified immunity shields public officials from liability for civil damages brought under § 1983 "so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Bland v. City of Newark*, 900 F.3d 77, 83 (3d Cir. 2018) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11, 136 S. Ct. 305, 308 (2015)). An individual seeking qualified immunity has the burden of establishing his entitlement to the affirmative defense. *Halsey v. Pfeiffer*, 750 F.3d 273, 288 (3d Cir. 2014) (citing *Reedy v. Evanson*, 615 F.3d 197, 223 (3d Cir. 2010)). To determine whether an individual is entitled to the affirmative defense of qualified immunity for a § 1983 claim, a court must determine (1) whether the individual violated a constitutional right and, if so, (2) whether the right was clearly established. *Reichle v. Howards*, 566 U.S. 658, 664 (2012). Courts should not "define clearly established law at a high level of generality." *Sauers v. Borough of Nesquehoning*, 905 F.3d 711, 716 (3d Cir. 2018). A court need not identify a case

directly on point for a right to be clearly established, but "existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017).

In assessing a claim of qualified immunity, like any other aspect of a summary judgment ruling, the court must not resolve genuine disputes of fact in favor of the moving party. It must decide whether the facts taken in the light most favorable to the non-moving party take the case to a place where the law is not clearly established. *See Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (*per curiam*). Taking the facts in that light, Mr. Minor was not in a policymaking position, and the DRBA's leadership terminated him for his political affiliations with Governor Murphy. It was clearly established in December 2017, at the time the DRBA fired him, that a public agency cannot fire a non-policymaking employee for his political affiliation. *See, e.g.*, *Elrod*, 427 U.S. at 355; *Galli*, 490 F.3d at 271; *Armour*, 271 F.3d at 420; *Assaf v. Fields*, 178 F.3d 170, 175-77 (3d Cir. 1999). Therefore, qualified immunity does not apply.

## IV.    CONCLUSION

A jury will have to resolve the factual disputes in this case, including whether Mr. Minor had a real, substantive job or just a luxury position at the DRBA and whether the DRBA fired him for cause or for being affiliated with Governor Murphy. The Court will deny Defendants' summary judgment motion, except as to the municipal liability claim against the DRBA. An appropriate Order follows.

**BY THE COURT**:

*/s/ Joshua D. Wolson*
JOSHUA D. WOLSON, J.

August 3, 2021